IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01952-PAB-CBS

SONEE ADDY,
        Plaintiff,
v.

PEORIA/TIMBERS JOINT VENTURE, and
SHERRON ASSOCIATES, INC.,
        Defendants.
_____

RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Craig B. Shaffer

        This civil action comes before the court on Defendants' Motion for Summary Judgment

(filed June 1, 2011) (Doc. # 31).  Pursuant to the Order of Reference dated August 23, 2010

(Doc. # 2) and the memorandum dated December 2, 2011 (Doc # 52), this matter was

referred to the Magistrate Judge.  The court has reviewed the Motion, Ms. Addy's Response

(initially filed on July 1, 2011 (Doc. # 38) and re-filed on September 26, 2011 (Doc. # 49)),

Defendants' Reply (filed August 4, 2011) (Doc. # 41), the exhibits, the affidavit, the entire case

file, and the applicable law and is sufficiently advised in the premises.


I.     Standard of Review

                The purpose of a summary judgment motion is to assess whether trial
        is necessary.  Rule 56(c) provides that summary judgment shall be granted if
        the pleadings, depositions, answers to interrogatories, admissions, or affidavits
        show that there is no genuine issue of material fact and the moving party is
        entitled to judgment as a matter of law. The non-moving party has the burden
        of showing that issues of undetermined material fact exist.  A party seeking
        summary judgment bears the initial responsibility of informing the court of the
        basis for its motion and identifying those portions of the pleadings, depositions,
        interrogatories, and admissions on file together with affidavits, if any, that it
        believes demonstrate the absence of genuine issues for trial.

Nutting v. RAM Southwest, Inc., 106 F. Supp. 2d 1121 (D. Colo. 2000) (internal quotation

marks and citations omitted).  In this procedural posture, therefore, the court's "role is simply

to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the

ultimate factfinder, to sustain h[is] claim." *Jones v. Barnhart*, 349 F.3d 1260, 1265-66 (10th Cir. 2003) (internal quotation marks and citation omitted).  While the court must "view the facts in the light most favorable to the plaintiff," *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011), nevertheless, "a plaintiff's version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

II.     Statement of the Case

On August 16, 2010, Ms. Addy filed her Complaint pursuant to 42 U.S.C. § 2000e, *et seq.* ("Title VII"), alleging: (1) sex discrimination; (2) hostile work environment; (3) wrongful termination; and (4) retaliation.  (*See* Complaint (Doc. # 1)).  Ms. Addy seeks injunctive relief, reinstatement or back pay, front pay and other benefits, lost wages and the value of other benefits, compensatory damages, costs, and attorney fees.  (*See id.* at 15 of 16).  Defendants move for summary judgment on the Complaint pursuant to Fed. R. Civ. P. 56 on the grounds that: (1) Ms. Addy does not show that Defendant Sherron Associates, Inc. ("Sherron") was her employer for purposes of Title VII; (2) she does not establish all of the elements of a prima facie case under Title VII; (3) Defendants present legitimate, non-discriminatory reasons for terminating her employment; (4) she does not demonstrate that Defendants' proffered reasons for terminating her employment were a pretext for discrimination based on her gender; (5) she does not demonstrate the existence of a hostile work environment; and (6) she does not demonstrate that she was terminated in retaliation for any protected activity.

A.     Factual Background

Ms. Addy is a Caucasian female who was employed as Director of Human Resources for the Timbers Hotel ("Hotel") from August 21, 2007 to December 2007 and as General Manager from December 2007 to January 27, 2009, when she was terminated from her employment.  (*See* Deposition of Sonee Addy, attached to Motion (Doc. # 31-1) at 3 of 8).  Sherron's business is forming partnerships to acquire real estate investments.  (*See*

Deposition of Thomas Armstrong, attached to Motion (Doc. # 31-2) at 3 of 9).  Mr. Armstrong is Vice President of Sherron and was in charge of construction and development of raw land parcels for 15 years.  (*See* Doc. # 31-2 at 3 of 9).  Sherron Associates Loan Fund 22, LLC ("Loan Fund") was the second mortgage holder against the Hotel based on a loan made to Charlie Walsh, the owner of the Hotel.  (*See* Doc. # 31-2 at 4-5 of 9).  When Mr. Walsh defaulted on the loan, the Loan Fund initiated foreclosure proceedings in or about August or September 2008.  (*See id.*).

In an effort to raise money "to pay the defaulted interest and provide initial operating capital and capital improvements to" the Hotel, the Loan Fund created the Timbers Group, LLC ("Timbers Group").  (*See id.* at 4 of 9).  The Loan Fund and the Timbers Group formed Peoria/Timbers Joint Venture ("Joint Venture").  (*See* Doc. # 31-2 at 4 of 9).  The Joint Venture purchased the Hotel on or about January 2, 2009.  (*See id.*).  Sherron was a managing member of the Joint Venture, acting as "the administrative office for the ownership group, . . . that communicated financial information and did most of the communication with the members or the venturers."  (*See id.*).

As part of the foreclosure proceedings, Rob Neirynack was appointed receiver of the Hotel.  (*See id.* at 5 of 9).[1]  At that time, Ms. Addy was the General Manager of the Hotel.  (*See* Doc. # 31-3 at 5 of 12;  Doc. # 49-2 at 9 of 54).  During the receivership, Mr. Neirynack was Ms. Addy's supervisor.  (*See* Doc. # 31-2 at 4-5 of 9;  Deposition of Eric Jack Skinner, attached to Motion (Doc. # 31-3) at 5 of 12).  Because he was not familiar with the operation of a hotel, in August or September of 2008, Mr. Neirynack entered into a consulting agreement with Landa Hotel Management, Inc., a company formed by Jack Skinner, to "develop a profit plan and a marketing plan."  (*See* Doc. # 31-2 at 5 of 9;  Doc. # 31-3 at 4-5

---

[1]   "A receiver is an indifferent person between the parties to a cause, appointed by the court to receive and preserve the property or fund in litigation pendente lite, when it does not seem reasonable to the court that either party should hold it. He is not the agent or representative of either party to the action, but is uniformly regarded as an officer of the court . . . ."  *In re Sundance Corp*, 83 B.R. 746, 749 (D. Mont. 1988) (internal quotation marks and citation omitted).

of 12).  At that time, Ms. Addy was off work due to injuries sustained in a car accident.  (*See* Doc. # 31-3 at 5 of 12;  Doc. # 49-2 at 14, 27 of 54).  Ms. Addy returned to work on or about October 7, 2008.  (*See* Doc. # 49-2 at 14, 27 of 54).  Mr. Skinner has extensive experience in hotel management, having spent "over 25 years in management with the Westin Hotels Company. . . ."  (*See* Doc. # 31-3 at 3 of 12).  He "held management positions in" three hotels in Seattle, Washington, "worked as the opening team of the Shangri-La Hotel in Singapore," "worked on the opening team of the Philippine Plaza Hotel in Manila," supervised "the reconstruction of the Arizona Biltmore Hotel in Phoenix, Arizona," and "managed the Renaissance Plaza Hotel" in Detroit, Michigan, "which is a 1,500-room hotel with over a million square feet of meeting space."  (*See* Doc. # 31-3 at 3 of 12; Doc. # 31-2 at 7 of 9).

On or about January 5, 2009, the Joint Venture took ownership of the Hotel and entered into a management agreement with Mr. Skinner's newly formed entity, Timbers Group 1, LLC.  (*See* Doc. # 31-3 at 5 of 12; Doc. # 31-2 at 4 of 9).  Under the management agreement, Mr. Skinner was Ms. Addy's immediate supervisor and had full authority to hire and fire employees.  (*See* Doc. # 31-2 at 7 of 9;  Doc. # 31-3 at 10, 11 of 12; Doc. # 49-2 at 19, 27, 31, 37 of 54; Plaintiff's Response to Defendants' Request for Admission No. 10, attached to Motion (Doc. # 31-4) at 5 of 7).  Ms. Addy was aware that Mr. Skinner was not her supervisor until January 5, 2009.  (See Doc. # 49-2 at 27, 31, 37 of 54).  Ms. Addy worked under Mr. Skinner's supervision for three weeks.

On January 27, 2009, Mr. Skinner met with Ms. Addy regarding invoices she was to have obtained from a vendor, Sysco.  During that meeting, Ms. Addy asked and Mr. Skinner agreed to meet together later with Mr. Armstrong.  (*See* Doc. # 31-1 at 4 of 8; Doc. # 31-3 at 8-9 of 12; Doc. # 49-2 at 28-30 of 54).  During the meeting with Mr. Armstrong and Mr. Skinner, Ms. Addy complained that Mr. Skinner was too critical of her and her staff and that she wanted to run the Hotel.  (*See* Doc. # 31-2 at 9 of 9).  She complained that Mr. Skinner had cancelled the celebration of birthday parties for staff members and that she could not work with his management style.  (*See* Doc. # 31-2 at 9 of 9).  She complained that he had

demoralized the staff and was taking actions to create poor morale.  (*See* Doc. # 31-3 at 9 of 12).  Ms. Addy concedes that she "went into this meeting of the 27th disrespecting" Mr. Skinner because he "just got done disrespecting me in front of the entire staff."  (*See* Doc. # 31-1 at 6 of 8).  Ms. Addy concedes that she had a professional and personality conflict with Mr. Skinner because she "disagreed with his unethical and inappropriate behavior."  (*See* Doc. # 31-1 at 8 of 8).  During the meeting, Ms. Addy did not complain of any discriminatory treatment.  (*See* Doc. # 31-2 at 9 of 9).  At the conclusion of the meeting, Mr. Skinner sent Ms. Addy home so that he could think over the situation.  (*See* Doc. # 31-3 at 10 of 12; Doc. # 49-2 at 44 of 54).

After the meeting, Mr. Skinner had concerns about continuing to work with Ms. Addy, based on his observations of Ms. Addy's job performance and her behavior in the meeting.  (*See* Doc. # 31-3 at 10 of 12).  Mr. Skinner was concerned that Ms. Addy had "five maintenance staff on site with basically no maintenance getting done," that the "sales staff was not monitored and were not producing room revenue at any acceptable level," that Ms. Addy did not have "a full budget and business plan in place," that "she had a difficult time getting her staff to perform," that her skill set "didn't match what a general manager mentality might be," that her department heads were inexperienced, that the sales staff had missed the deadline for an upcoming sales exposition, and that Ms. Addy worked too few hours. (*See* Doc. # 31-2 at 7, 8 of 9;  Doc. # 31-3 at 6-10 of 12; doc. # 49-2 at 40 of 54).  A day or two after the meeting, Mr. Skinner terminated Ms. Addy's employment.  (*See* Doc. # 31-2 at 7 of 9; Doc. # 31-3 at 11 of 12).  Mr. Skinner later acted as the General Manager of the Hotel. (*See* Doc. # 31-2 at 9 of 9;  Doc. # 31-3 at 12 of 12).

After she was terminated, Ms. Addy communicated with Mr. Skinner by several e-mails. (*See* Exhibit G to Motion (Doc. # 31-7)).  Ms. Addy inquired about her severance package, including health insurance.  (*See id.*).  Ms. Addy did not mention discriminatory treatment in any of these communications. (*See id.*).

III.    Analysis

A.    Discrimination Based on Gender

Ms. Addy alleges that she was discharged from her employment based on her gender. (*See* Doc. # 33-1 at 5-6 of 8).  Under Title VII of the Civil Rights Act of 1964, as amended, it is unlawful for an employer ". . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).  Ms. Addy does not present direct evidence of discrimination.  Thus, the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Ms. Addy's claim of gender discrimination.  *See Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) ("Where a plaintiff relies on circumstantial evidence, the Supreme Court has established a three-step burden-shifting framework for determining whether a plaintiff's evidence raises an inference of invidious discriminatory intent sufficient to survive summary judgment").  Under the *McDonnell Douglas* analysis, "the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination."  *Jackson v. City and County of Denver*, 628 F. Supp. 2d 1275, 1284 (D. Colo. 2008).  "If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason" for its employment decision.  *Id.*, at 1284-85 (internal quotation marks omitted).  If the defendant employer "presents such a reason, the plaintiff bears the ultimate burden of showing that these proffered reasons are a pretext for unlawful discrimination."  *Id.* at 1285.

1.    Prima Facie Case

To establish a prima facie case of discriminatory discharge based on gender in violation of Title VII, Ms. Addy must "demonstrate that she (1) belongs to a protected class; (2) was qualified for her position; (3) was discharged; and (4) her position was not eliminated after her discharge." *Adamson*, 514 F.3d at 1150 (citations omitted).  "The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment

action occurred under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 1151 (internal quotation marks and citation omitted).  Defendants do not contest that Ms. Addy can show that she is a member of a protected class and that termination of her employment was an adverse action.

>   a.   Existence of Employment Relationship between Ms. Addy and Sherron

Sherron argues that it cannot be liable for any of Ms. Addy's claims because it was not her employer.  Title VII makes it unlawful "for an employer . . . to discriminate," *inter alia*, on the basis of gender.  42 U.S.C. § 2000e-2(a)(1).   Title VII defines "employee" as "an individual employed by an employer. . . ." 42 U.S.C. § 2000e(f).  It is Ms. Addy's burden to establish under Title VII that she is entitled to relief because she had an employment relationship with Sherron.  *See Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998) ("In order to establish a prima facie case under Title VII, [Plaintiff] was required to prove, among other things, that [Defendant] was her employer.") (citation omitted).

In response, Ms. Addy argues that "the Defendants were in control of the hotel during all relevant time periods and at some point delegated this duty but the Defendants never relinquished control over the entity," that "Sherron had complete control of all of the operations and it delegated the day to day running of the property to Jack Skinner and his legal entity," and that "Plaintiff believes that her employer was Sherron."  (*See* Response (Doc. # 49) at 3-4, 6-8 of 13;  *see also* Doc. # 49-1 at 17 of 19 ("I was employed by Sherron Associates, Inc. via Peoria Joint Venture established by Sherron Associates, Inc."), Doc. # 49-3; Affidavit of Sonia Alcala, attached to Response (# 49-4)).[2]  Even if it considers Ms. Alcala's affidavit, the court concludes that Ms. Addy's evidence is insufficient to establish that

---

>   [2]   Defendants argue that Ms. Alcala's affidavit should be stricken as presenting no more than speculation, hearsay, and conclusory allegations.  *See Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1990) ("generalized, unsubstantiated, non-personal affidavits are insufficient to successfully oppose a motion for summary judgment") (internal quotation marks and citation omitted).

Sherron was her employer.

Ms. Addy has not disputed or presented evidence that refutes that Sherron's "role was to communicate financial information to the other members of the Joint Venture and to investors." (*See* Motion (Doc. # 31) at 3 of 21, ¶ 4; Response (Doc. # 49) at 3-6 of 13). Ms. Addy has admitted that she was employed by the Joint Venture. (*See* Doc. # 31-4 at 5 of 7). Ms. Addy also admits her 2009 Tax Statement identifies the Joint Venture as her employer. (*See* Exhibit E to Motion (Doc. # 31-5); Doc. # 49 at 3-6 of 13). Neither Sherron nor Mr. Armstrong was responsible for the day-to-day operations of the Hotel. (*See* Doc. # 31-2 at 9 of 9). Ms. Addy was aware that Mr. Skinner became her supervisor on or about January 5, 2009. (See Doc. # 49-2 at 27, 31, 37 of 54).

Ms. Alcala attests that she sent Sherron information regarding financial matters of the Hotel on a daily basis. This evidence is not inconsistent with the other evidence of Sherron's role in the Joint Venture. Ms. Alcala's communications with Sherron regarding financial matters do not demonstrate that Sherron was Ms. Addy's employer for purposes of her Title VII claims. Ms. Alcala attests that "it was my understanding that we were employed by and through Sherron & Associates." Ms. Alcala's "understanding" and Ms. Addy's "belie[f]" that they were employed "by and through Sherron" or by Sherron "via" the Joint Venture do not alter the substantiated evidence that Sherron was not her employer.

> For dispositive issues on which the plaintiff will bear the burden of proof at trial, he must go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [his] case in order to survive summary judgment. [E]vidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.

*Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) (internal quotation marks and citations omitted). Ms. Addy's burden in responding to Defendants' Motion is to designate specific facts demonstrating a genuine issue of fact for trial with respect to her claims. Ms. Addy presents merely conclusory arguments and insufficient evidence to create a genuine issue of fact whether Sherron was her employer.

Ms. Addy argues "in the alternative" that "the joint employer doctrine" makes Sherron

her employer, citing *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 616 (5th Cir. 1999).  (*See* Doc. # 49 at 7 of 13).   Under the joint-employer test, "a plaintiff who is the employee of one entity may seek to hold another entity liable by claiming that the two entities are joint employers."  *Bristol v. Board of County Commissioners of County of Clear Creek*, 312 F.3d 1213, 1218 (10th Cir. 2002).   "[T]he joint-employer test assumes that the alleged employers are separate entities."  *Id.  See also Sandoval v. City of Boulder*, 388 F.3d 1312, 1323-24 (10th Cir. 2004) (joint employer test is "employee-specific," "focusing on the entities' relationships to a given employee or class of employees").   The joint-employer test "acknowledges that the two entities are separate, but looks to whether they codetermine the essential terms and conditions of employment."  *Bristol*, 312 F.3d at 1218.  "Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances."  *Id.* at 1219.  "In other words, courts look to whether both entities exercise significant control over the same employees."  *Id.* at 1218.  *See also Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 993 n. 4 (6th Cir. 1997) ("The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.").

Ms. Addy fails to present any material fact demonstrating that Defendant Sherron shared or codetermined the essential terms and conditions of her employment.  Ms. Addy's evidence does not establish that Sherron was in control of all operations or, more importantly, in control of employment matters.  Ms. Addy does not dispute that Mr. Skinner supervised her commencing on or about January 5, 2009, when the Joint Venture took ownership of the Hotel and entered into a management agreement with Mr. Skinner's company, Timbers Group 1, LLC.   The evidence indicates that Mr. Skinner directed or controlled Ms. Addy's performance on a daily basis.  The record establishes that Mr. Skinner alone retained the ability to terminate Ms. Addy, indicating Sherron was not her employer.  The *Skidmore* case cited by Ms. Addy supports Defendants' position that Sherron was not Plaintiff's employer for

Title VII purposes.  The *Skidmore* court held that the primary determining factor was what entity made the employment decisions regarding the plaintiff.  188 F.3d at 616-17 ("courts have focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?").  There is no evidence that Mr. Armstrong played any role in terminating Ms. Addy's employment.  Here, final decisions regarding employment matters were made by Mr. Skinner, not Sherron.

Apart from the issue of supervision and evaluation, it is uncontroverted that Ms. Addy received compensation and benefits from the Joint Venture, not Sherron.  (*See, e.g.,* Doc. # 31-5).  Tellingly, at the time of her termination, Ms. Addy negotiated the terms of her severance package with Mr. Skinner, not with Sherron.  The evidence Ms. Addy presents, even read in the light most favorable to her, does not raise a genuine issue of fact that Sherron controlled the means and manner of her work performance to the degree necessary to support a finding that she was an employee of Sherron.  Based on the record, the court cannot conclude that Ms. Addy has satisfied her burden of proving that Defendant Sherron should be held liable as an employer under Title VII.  Defendant Sherron is therefore entitled to summary judgment on Ms. Addy's Complaint.

Further, Defendants argue that Ms. Addy fails to establish a prima facie case of gender discrimination because she fails "to show a causal connection between her gender or any protected activity and termination of her employment." (*See* Doc. # 31 at 13 of 21).  However, at the prima facie stage, the plaintiff's burden is "not onerous."  *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th  Cir. 2005) (internal quotation marks and citation omitted).  *See also Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1171 (10th Cir. 2007) ("Under this formula, a Title VII plaintiff first must establish a prima facie case of discrimination – a burden so light that only the most baseless of claims fails to satisfy it.").  "[I]n light of the Supreme Court's admonition that the prima facie case is not to be an onerous or ritualistic burden," the Tenth Circuit concluded that "a plaintiff may make out a prima facie case of discrimination in a discharge case by . . . her own testimony that her work was satisfactory, even when disputed

by her employer, . . ."  *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992) (internal quotation marks and citation omitted).  Given Defendants' general argument and the relatively light burden placed on an employee at the prima facie stage, the court assumes that Ms. Addy has presented evidence that her termination arose under circumstances that could imply gender discrimination.

        2.      Legitimate, Non-Discriminatory Reasons for Termination of Employment

        Defendants have articulated legitimate, non-discriminatory reasons for terminating Ms. Addy's employment.  Defendants present evidence that Mr. Skinner had concerns about Ms. Addy's role as the General Manager of the Hotel, due to the lack of a budget, business, or profit plan, her comments to a sales employee, her failure to hire a director of sales, her sales department's failure to participate in a nearby sales exposition, her failure to complete an assignment regarding Sysco invoices, her apparent lack of a sense of urgency and momentum with her work, low performance of her staff, and her unprofessional behavior. (Doc. # 49-2 at 28-29, 40 of 54; Doc. # 31-1 at 4, 6 of 8; Doc. # 31-2 at 7, 8 of 9; Doc. # 31-3 at 7-10 of 12; Doc. # 49-4 at 3 of 7).  After her behavior during the meetings on January 27, 2009, Mr. Skinner decided that he could not work with Ms. Addy.  (*See* Doc. # 31-3 at 8-11 of 12).  At this stage of the *McDonnell Douglas* analysis, Defendants' burden is "exceedingly light;" Defendants must merely proffer non-discriminatory reasons, not prove them.  *Zamora*, 478 F.3d at 1165-66 (internal quotation marks and citation omitted).  *See also EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992) (at this stage, defendant is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII.").  Because Defendants' proffered reasons are not "facially prohibited by Title VII," *Flasher*, 986 F.2d at 1317, the court concludes that Defendants have articulated a legitimate, nondiscriminatory reason for terminating Ms. Addy and have satisfied their burden.

3.      Pretext

A plaintiff can withstand summary judgment if she presents evidence sufficient to raise a genuine dispute of material fact regarding whether the defendant's articulated reasons for the adverse employment action are pretextual.  *See Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 147–49 (2000).  As Defendants articulate non-discriminatory reasons for terminating Ms. Addy's employment, the burden reverts back to Ms. Addy to show that "there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – i.e., unworthy of belief."  *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  "Pretext exists when an employer does not honestly represent its reasons for terminating an employee."  *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).  "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [it] honestly believed those reasons and acted in good faith upon those beliefs."  *Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (internal quotation marks and citation omitted).

To show pretext, a plaintiff must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1280 (10th Cir. 2010) (internal quotation marks and citation omitted).  Evidence of pretext may take a variety of forms.  *Swackhammer v. Sprint/United Management Co.*, 493 F.3d 1160, 1167-68 (10th Cir. 2007).  "One typical method for a plaintiff to prove pretext is by providing direct evidence that the defendant's stated reason for the adverse employment action was false."  *Swackhammer*, 493 F.3d at 1167 (citation omitted). "Another common method is a differential treatment argument, in which the plaintiff demonstrates that the employer treated [the plaintiff] differently from other similarly-situated employees who violated work rules of comparable seriousness in order to show that the employer failed to follow typical company practice in its

treatment of the plaintiff." *Id.* at 1167-68. *See also Kendrick v. Penske Transp. Serv., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (employee may show employer's proffered reason to be pretextual in a variety of ways: by showing that the stated reason is false, by showing that the employer acted contrary to a written company policy, or by showing that the employer acted contrary to an unwritten company policy or practice, among others).

> To support an inference of pretext, to suggest that something more nefarious might be at play, a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda. This is because Title VII licenses us not to act as a "super personnel department" to undo bad employment decisions; instead, it charges us to serve as a vital means for redressing discriminatory ones.

*Johnson v. Weld County, Colorado*, 594 F.3d 1202, 1211 (10th Cir. 2010) (citation omitted).

Once the employer's proffered reason is shown to be pretextual, the factfinder may infer that prohibited discrimination is the real cause for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519  (1993).  In determining whether the proffered reasons for a decision were pretextual, the court must examine "the facts as they appear to the person making the decision to terminate [Ms. Addy]." *Salguero v. City of Clovis*, 366 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks and citations omitted).  Ms. Addy bears the burden of showing that each reason given by the employer is unworthy of credence.  *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1308 (10th Cir. 2005).

Ms. Addy does not specifically contest Mr. Skinner's observations of her performance problems as General Manager of the Hotel.  As support for her claim of gender discrimination, Ms. Addy provides her deposition testimony that Mr. Skinner: (1) called an African American employee "a lazy f'ing black guy," (2) commented that she should act more like a man, (3) made comments "that could be construed as sexual harassment to younger women who worked on the property," (4) invited her to join him for wine and cheese and crackers, (5) visually "undress[ed] women" who walked by, (6) made an offensive joke about placing a nude picture of himself in a brochure, and (7) "told other staff members I was a "stupid bitch."

(*See* Doc. # 49 at 8 of 13).  The court concludes that Ms. Addy's evidence does not establish that Defendants' reasons for her termination were a pretext for gender discrimination under Title VII.

Ms. Addy concedes that it is typical after a receivership, when new management comes in, that they like to bring in their own people.  (*See* Doc. # 49-2 at 12 of 54).  While Ms. Addy argues "there is a dispute of fact as to whether or not the management of the property was taking a 'different direction,' " (*see* Doc. # 49 at 6-7 of 13), she concedes that it is a nondiscriminatory, legitimate business reason for terminating employment if the new owners are moving in a new direction, and "it was Jack Skinner's prerogative as the managing partner to discharge" Hotel employees.  (*See* Doc. # 31-1 at 7 of 8; Doc. # 49-2 at 51, 54 of 54).  Ms. Addy tells prospective employers that "I was discharged" because "the hotel went through a receivership . . ." or a "change in ownership," and she considers that an honest answer.  (*See id.* at 8 of 8).

Mr. Skinner expressed dissatisfaction with both male and female employees.  (See Doc. # 49-2 at 25 of 54).  Seven or eight other employees, including males, were terminated as a result of the change in ownership of the Hotel.  (*See* Doc. # 49-2 at 51 of 54).  Ms. Addy presents an affidavit that "on several occasions [Mr. Skinner] would belittle and embarrass older men."  (*See* Doc. # 49-4 at 5 of 7).  Mr. Skinner's alleged comment that an African American employee was "a lazy f'ing black guy" does not establish a claim for gender discrimination against Ms. Addy, as it does not relate to gender and was not directed at or witnessed by Ms. Addy.  (See Doc. # 49-2 at 22-24 of 54).  At the time of this alleged statement, Ms. Addy knew that Mr. Skinner was not her supervisor and had no authority over the employees.  (*See id.* at 23 of 54).

Ms. Addy attests that Mr. Skinner commented "if you act like a man around here, you wouldn't let everyone henpeck you." (*See* Doc. # 49-2 at 45 of 54; *see also* 26-27 of 54).  This comment does not establish a bias against women and is consistent with Mr. Skinner's concern about the lack of performance and productivity of Ms. Addy's staff.  Ms. Addy attests

that Mr. Skinner made comments "that could be construed as sexual harassment to younger women who worked on the property." (*See* Doc. # 49 at 8 of 13).  Ms. Addy's allegation that Mr. Skinner "liked younger women but not older ones" (*see* Doc. # 49 at 11 of 13; Doc. # 49-4 at 5 of 7) does not demonstrate gender discrimination.  Mr. Skinner's alleged comment to a young female employee that she looked attractive in the outfit she was wearing was not directed toward Ms. Addy.  Ms. Addy conclusorily alleges that the comment was offensive to that employee.  (*See* Doc. # 49-2 at 26-27 of 54).  The comment does not demonstrate gender discrimination and occurred before Mr. Skinner supervised any employees. (*See* Doc. # 49-2 at 26-27 of 54).  Mr. Skinner's alleged comment when two young women employees "walked up to the sales meeting, . . . 'That's what we need to hire more of' " does not demonstrate gender discrimination and occurred before he supervised any employees. (*See* Doc. # 49-2 at 36-37 of 54).  Ms. Addy presents evidence that when the sales manager showed "two girls" around the restaurant, Mr. Skinner "stood up, shook their hands, . . . and introduced himself as the owner and said if there is anything he could do for them, let him know." This incident is innocuous, does not establish gender discrimination against Ms. Addy, and occurred before Mr. Skinner was Ms. Addy's supervisor.  (*See* Doc. # 49-2 at 34 of 54).

Ms. Addy contends that Mr. Skinner would "look[ ]" at a woman and "undress[ ]" her. (*See* Doc. # 49-2 at 32-33 of 54).  Ms. Addy concedes he never did this to her.  Ms. Addy offers no specific instances of such conduct.  This contention is purely Ms. Addy's subjective interpretation and is not sufficient to demonstrate gender discrimination.  Ms. Addy presents evidence that Mr. Skinner made a comment in a marketing meeting while holding a folded piece of paper and said "How about when I open it, I'm in the center naked?" (*See* Doc. # 49-2 at 36 of 54).  Ms. Addy found the comment "inappropriate."  *But see, Oncale v. Sundowner Offshore Servs., Inc.*, 523 U .S. 75, 81 (1998) (Title VII does not proscribe conduct "merely tinged with offensive sexual connotations.").  There is no evidence that this comment was directed at anyone based on their gender.  Ms. Addy establishes no connection between this comment and her termination.   Mr. Skinner's mere invitation to Ms. Addy to join him for wine

and cheese and crackers in his room does not demonstrate gender discrimination.  When Ms. Addy declined the invitation, Mr. Skinner brought the wine down to the lobby and urged her to try it.  (*See* Doc. # 49-2 at 30 of 54).  Mr. Skinner was not her supervisor at that time.  (*See* Doc. # 49-2 at 30-31, 34 of 54).

Ms. Addy attests that Mr. Skinner called her a "stupid bitch" to other members of the staff.  (*See* Doc. # 49-2 at of 54).  Ms. Addy did not hear Mr. Skinner call her inappropriate names, and offers only the hearsay statements of others to support her contention.  There is no evidence that this alleged statement was made while Mr. Skinner was Ms. Addy's supervisor.  Using an epithet characterizing only one person as unpleasant is not an indication of discrimination against women in general.  *See Kriss v. Sprint Communications Co., Ltd.*, 58 F.3d 1276, 1281 (8th Cir. 1995).

While Ms. Addy argues "[t]here was no [bona fide] reason for the termination and Plaintiff has established a dispute of fact relating to this part of the analysis" (*see* Doc. # 49 at 9 of 13), she has not established that her termination was based on a discriminatory motive related to gender.  If Mr. Skinner made rude or inappropriate statements in the workplace, such comments did not negate the deficiencies in Ms. Addy's performance that provided the grounds for her termination.  Evidence presented by Ms. Addy demonstrates that while Mr. Skinner and Ms. Addy argued on January 27, 2009, "the argument began regarding some invoices with Nobel Sysco and employee appreciation events," continued "about how she doesn't know how to run a hotel," and was not related to gender.  (*See* Doc. # 49-4 at 3 of 7). *See Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1281 (10th Cir. 2003) (To demonstrate a discriminatory motive, a plaintiff must show "a nexus between the allegedly discriminatory statements [and actions] and the defendant's decision to terminate the plaintiff.") (internal quotation marks and citation omitted).  Even if Mr Skinner were mistaken in his assessment of Ms. Addy's job performance, there is no evidence that he did not honestly believe that Ms. Addy was not performing satisfactorily in the job of General Manager.  *See Locke v. Grady County*, 2011 WL 3648140, at * 5 (10th Cir. Aug. 19, 2011)

(facts appearing to decisionmaker at the time provided a legitimate, non-discriminatory reason for firing plaintiff).  Ms. Addy has not presented facts from which a reasonable jury could conclude that the decision to terminate her was so meritless as to call into question its actual motivation.  Ms. Addy has not produced evidence "of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (internal quotation marks and citation omitted).  Ms. Addy's evidence does not create a genuine dispute as to any material fact that merits a trial on her claim for gender discrimination.

C.      Hostile Work Environment

        "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). To survive summary judgment on a hostile work environment claim, a plaintiff must show a rational jury could find from the totality of the circumstances: (1) "that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Stinnett v. Safeway*, Inc., 337 F.3d 1213, 1219 (10th Cir. 2003), and (2) that the hostility or harassment is based upon the plaintiff's gender, *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).  *See also Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) ("[T]he harassment must be because of the plaintiff's sex.").

        "A plaintiff does not make a showing of a pervasively hostile work environment by demonstrating a few isolated incidents . . . ." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  A hostile work environment claim "must be based on severe and pervasive discriminatory intimidation or insult." *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003). "One of the critical inquiries in a hostile environment claim must be the *environment*.

Evidence of a general work atmosphere . . . -- as well as evidence of specific hostility directed toward the plaintiff -- is an important factor in evaluating the claim." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987) (emphasis in original).   Among the factors appropriately considered are (1) whether the discriminatory conduct is frequent or severe, (2) whether it is physically threatening or humiliating, or a mere offensive utterance, and (3) whether it unreasonably interferes with an employee's work performance. *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1264 (10th Cir. 1998).   The plaintiff must demonstrate that the work environment was hostile under both an objective and subjective standard. *Witt v. Roadway Express*, 136 F.3d 1424, 1432-33 (10th Cir. 1998).  In considering whether the environment is sufficiently hostile, the court must look at the totality of the circumstances. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).

Ms. Addy attempts to establish her hostile work environment claim with the same incidents that form the basis of her gender discrimination claim.  The court has determined that the evidence is not sufficient to support Ms. Addy's independent claim that she was terminated from her employment based on her gender.  For the same reasons the court finds Ms. Addy's evidence insufficient to support her claim of termination based on her gender, the court finds that Ms. Addy's evidence does not establish a hostile work environment claim. "Discrete acts constituting discrimination . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult." *Lester v. Natsios*, 290 F. Supp. 2d 11, 33 (D.D.C. 2003)

The evidence in the record does not suggest that Ms. Addy endured discriminatory intimidation, ridicule, insult, or behavior that was offensive, pervasive, severe, or abusive. *See Oncale*, 523 U.S. at 81.  Ms. Addy worked with Mr. Skinner for a total of four months, from October 2008 to January 2009, and was supervised by Mr. Skinner for only three weeks, from January 5 to January 27, 2009.  Ms. Addy objected to events and conduct that occurred in her last few months of employment.   Mr. Skinner criticized her job performance and the performance of her staff.   The incidents that Ms. Addy alleges created a hostile work

environment are not sufficiently severe "to alter the conditions of the victim's employment and create an abusive working environment." *Velasquez v. Frontier Medical Inc.*, 375 F. Supp. 2d 1253, 1277-78 (D. N.M. 2005) (internal quotation marks and citation omitted). To the contrary, the incidents alleged by Ms. Addy "are more similar to other cases in which the Tenth Circuit has affirmed summary judgment on the plaintiff's sexual harassment claim." *Id.* (citing *Kirk v. City of Tulsa*, 72 F. App'x. at 751 (affirming summary judgment because, even though the plaintiff alleged eight incidents, two of which contained "sexually offensive remarks about women, of which one was directed at [the p]laintiff, although made in her absence," and even though the male co-worker's "behavior is reprehensible, the correction of indiscriminate boorishness and vulgarity in the workplace is not the function of a Title VII action for a sexually hostile environment") (additional citations omitted). *See also Kline v. Utah Anti-Discrimination and Labor Division*, 418 F. App'x 774, 783 (10th Cir. 2011) ("two inappropriate jokes and a few overheard comments which contained sexual innuendo are not severe or pervasive enough to create a hostile work environment"); *Boyd v. Presbyterian Hosp.*, 160 F. Supp. 2d 522, 541-42 (S.D.N.Y. 2001) (holding that while an African-American nurse was subjected to gossip, lower performance evaluation, and intense scrutiny of her work performance that were annoying, bothersome, and stress-inducing, they did not create a hostile work environment).

Nor is Ms. Addy's evidence sufficient to create a jury question that her working conditions were inflicted upon her because of her gender. Of the allegations Ms. Addy makes, almost none have arguably any gender implications. *See Penry*, 155 F.3d at 1263 (court considers evidence of all conduct that is either gender-based or has "gender-related implications"). Even after viewing the facts and inferences in Ms. Addy's favor and considering the "general work atmosphere . . . [and the] evidence of specific hostility directed toward the plaintiff . . . ," the court concludes that she has not met her burden of showing discrimination because of her gender. *Riske v. King Soopers*, 366 F.3d 1085, 1091 (10th Cir. 2004) (internal quotation marks and citations omitted). Defendants are entitled to summary judgment on Ms. Addy's hostile work environment claim.

D.    Retaliation

Ms. Addy's Third and Fourth Claims for Relief appear duplicative.  In her Third Claim for Relief, Ms. Addy alleges that she "was terminated due to her complaints about discrimination, harassment and retaliation in the workplace, . . . her complaints about Mr. Skinner's behavior toward her and other employees," and "in retaliation for her complaints regarding her protected rights against discrimination in the workplace and her protected classification." (*See* Doc. # 1 at ¶¶ 121-125).  In her Fourth Claim for Relief, Ms. Addy alleges that she "was terminated by Defendants due to her complaints about discrimination." (*See* Doc. # 1 at ¶ 131).

Title VII forbids retaliation against an employee because she has "opposed" any practice made unlawful by Title VII, or because she has "participated . . . in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).   Where there is no direct evidence of retaliation, the burden-shifting analysis established in *McDonnell Douglas* also applies to retaliation claims.  *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1229-30 (10th Cir. 2000).  To establish a prima facie claim of retaliation, a plaintiff is required to prove that (1) she engaged in protected activity, (2) a reasonable employee would have found the challenged action materially adverse, and (3) there is a causal connection between the protected activity and the adverse employment action.  *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006) (citation omitted).  A materially adverse act is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted).  To establish a causal connection, a plaintiff must prove that the adverse employment actions would not have occurred "but for" her protected activity. *Vialpando v. Johanns*, 619 F. Supp. 2d 1107, 1118 (D. Colo. 2008).  Additionally, when a defendant asserts non-discriminatory reasons for its actions, a plaintiff must also establish that the defendant's reasons are a pretext. *Stover v. Martinez*, 382 F.3d 1064, 1070-71 (10th Cir. 2004).

For purposes of a prima facie case, Defendants do not contest that termination is an adverse employment action.  Defendants contest and the court is not convinced that Ms. Addy has established that she engaged in protected activity.  Ms. Addy acknowledges that it was the January 27, 2009 meeting that precipitated her termination.  (*See* Doc. # 49-2 at 45 of 54 ("I was discharged, in my opinion, on a retaliation for speaking up and embarrassing him in front of his manager.");  *see also* Doc. # 31-1 at 5 of 8 ("that's why I lost my job, because I finally spoke up and said, 'This can't keep going on.  We're losing staff.  Staff is walking around in tears. . . ."); at 6 of 8 ("I indicated that I felt that I was discharged because I was retaliated against for speaking out on behalf of the entire hotel."); at 7 of 8 ("I believe I was retaliated against for being a spokesperson for the hotel as a general manager."); at 8 of 8 ("I believe I was fired because I was retaliated against for speaking up on behalf of the hotel.")).  Even if "speaking up on behalf of the hotel" and "embarrassing [Mr. Skinner]" can be considered protected activities, Defendants argue that Ms. Addy has not established a causal connection between the protected activity and her termination.

"To establish the requisite causal connection between [her] protected conduct and termination, [Ms. Addy] must show that [Defendants were] motivated to terminate [her] employment by a desire to retaliate for [her] protected activity."  *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) (citation omitted).  "As a prerequisite to this showing," Ms. Addy "must first come forward with evidence from which a reasonable factfinder could conclude that those who decided to fire [her] had knowledge of [her] protected activity."  *Id.* (citation omitted).  *See also Williams v. Rice*, 983 F.2d 177, 181 (10th Cir.1993) ("To establish a causal connection, plaintiff must show that the individual who took adverse action against him knew of the employee's protected activity.").  "Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against that employee because of the protected conduct, as required by statute." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1195 (10th Cir. 2007).  *See also Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188-89 (10th Cir. 2002) (explaining that employer must know of employee's protected activity in order

to engage in unlawful retaliation).

While Ms. Addy discussed her concerns about the Hotel's management with other employees, the evidence is disputed as to whether she reported any discriminatory conduct to management.  (*See* Doc. # 31-1 at 5 of 8; Doc. # 31-2 at 9 of 9; Doc. # 31-3 at 8 of 12).  She had "conversations with those who came to me and brought it to my attention that they were upset." (*See* Doc. # 31-1 at 5 of 8).  Ms. Addy presents evidence that she complained to Mr. Skinner on numerous occasions about how he was running the Hotel.  (*See* Doc. # 31-1 at 6 of 8).  She "disagreed with his unethical, inappropriate behavior," had a personality conflict with him, and "had a conflict with his behavior."  (*See* Doc. # 31-1 at 8 of 8).  Mr. Skinner acknowledges that Ms. Addy disagreed with him about how to run the Hotel.  (*See* Doc. # 31-3 at 8 of 12).  On January 27, 2009, Ms. Addy accused Mr. Skinner of creating a hostile work environment.  (*See* Doc. # 31-3 at 8 of 12).

Even if the court assumes Ms. Addy establishes a prima facie case of retaliation, Defendants present non-discriminatory reasons for Ms. Addy's termination.  Defendants present evidence that Ms. Addy was terminated based on Mr. Skinner's concerns about her inability to complete certain important tasks he delegated to her and because she behaved belligerently and unprofessionally in two meetings on January 27, 2009, leading him to conclude that he could no longer work with her.  (*See* Doc. # 31-3 at 8-11 of 12).  Thus, Ms. Addy must establish that Defendants' reasons are a pretext for discrimination.  *Stover*, 382 F.3d at 1070-71.

Ms. Addy does not present sufficient evidence to show that the Defendants' explanation for her termination was so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief and a pretext for discrimination based on her exercise of a protected activity.  *Stover*, 382 F.3d at 1070-71.  She complained to Mr. Skinner many times prior to January 27, 2009 about his behavior and was not previously sent home or terminated.  (*See* Doc. # 49-2 at 47-50 of 54).  At the January 27, 2009 meeting, she again raised her objections to "some of the things he continued to do." (*See id.*).  The fact that Ms. Addy continued to

complain belies any allegation that she was retaliated against for complaints she made prior to January 27, 2009. *See Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008) ("the fact that an employee continues to be undeterred in his or her pursuit of a remedy, as here was the case, may shed light as to whether the actions are sufficiently material and adverse to be actionable").

Ms. Addy argues that "her discussion with Mr. Armstrong" on January 27, 2009 "caused her termination." (*See* Doc. # 49 at 11 of 13). Mr. Armstrong did not make the decision to terminate Ms. Addy. After the meeting, Mr. Skinner thought things over and ultimately decided that Ms. Addy's termination was in the best interests of the Hotel. (*See* Doc. # 31-3 at 10-11 of 12). The evidence shows that Ms. Addy's behavior toward her supervisor on January 27, 2009 and her failure to complete delegated tasks were the grounds for her termination. "[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was genuine or pretextual." *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000) (citation omitted). Ms. Addy offers no more than conjecture that her employer's explanation for her termination was a pretext for intentional discrimination. Conjecture is insufficient to overcome a motion for summary judgment. *Underwood v. GEO Group, Inc.*, 2011 WL 5593150, at * 9 (D. Colo. Nov. 17, 2011). The evidence does not support Ms. Addy's claim that she would not have been terminated as General Manager "but for" her protected activity, rather than because of her job performance and her behavior on January 27, 2009 that led Mr. Skinner to conclude that he could no longer work with her. *See, e.g., Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1219 (10th Cir. 2003) (subordinate's transfer because she and her supervisor could not work together was not pretext for retaliation). The evidence she presents is not "sufficient to raise a genuine doubt about Defendant[s'] motivation." *Jones*, 349 F.3d at 1268 (internal quotation marks and citation omitted). The court concludes that Ms. Addy fails to establish genuine issues of material fact to survive summary judgment on her wrongful termination and retaliation claims.

Accordingly, IT IS RECOMMENDED that Defendants' Motion for Summary Judgment (filed June 1, 2011) (Doc. # 31) be GRANTED and that summary judgment enter on the Complaint (Doc. # 1) in favor of Defendants and against Plaintiff.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.   "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado, this 13th day of January, 2012.

BY THE COURT:


     s/Craig B. Shaffer
United States Magistrate Judge